S.A. STERN, trading as Al Stern Realty, Appellant,

v.

J. NICHOLS PRODUCE COMPANY, INC., et al., Appellees.

No. 82–1667.

District of Columbia Court of Appeals.

Argued Oct. 13, 1983.

Decided Dec. 31, 1984.

Neil Intrater, Washington, D.C., for appellant.

Rebecca J. Habbert, Washington, D.C., for appellees.

Before NEBEKER, BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant, a real estate broker, seeks reversal of a trial court judgment denying his claim to a monthly commission under a subleasing agreement. He argues first that he was the beneficiary of an express trust. Alternatively, he contends that the court erred in not imposing an equitable lien or constructive trust on that portion of the monthly rent received by the sublessor, a bankrupt partnership, which was designated to satisfy his commission. We reject both arguments and hold that appellant is not the beneficiary of any trust, express or constructive, and is not entitled to an equitable lien; rather, he is an unsecured, non-judgment creditor, whose claim is subordinate to those of the five appellees, all of them judgment creditors. The case is complicated, however, by a notice of tax levy which the Internal Revenue Service issued after the judgment was entered below. In light of that notice and of the tax lien or liens which it may represent, we remand the case to the trial court for further proceedings to determine the priority in which the partnership's creditors are to be paid.

I

During the late 1970's, a partnership by the name of Adam & Eve Associates opened a restaurant in downtown Washington known as the Apple Tree. Security National Bank provided the financing for this venture and secured its loan by perfecting a security interest in all of the Apple Tree's assets, including the lease for the premises in which it was located.

Over the next few years the Apple Tree incurred substantial debts, and in January 1982 the partnership defaulted on its loan with Security National. In accordance with the terms of the security agreement, the bank took possession of the restaurant and its contents. The partnership then contacted appellant, a real estate broker, to see if he could find a tenant that might be interested in occupying the premises.[1] Appellant was successful, and on February 3 the Sichuan Garden Corporation entered into a subleasing agreement for the premises with the partnership.[2] Clause 18 of the agreement, captioned "Commission," provided in pertinent part:

> The parties do hereby recognize Al Stern Realty, a proprietorship, as the procuring agent for this Sublease transaction. The parties further recognize that the said procuring agent is entitled to a commission of $500 per month for the period commencing May 1, 1982 and ending at the expiration of the sublease term. The Sublessor [Apple Tree] shall be required to pay the commission, but only from proceeds received from Sublessee [Si-

---

1. Security National and the landlord agreed to this arrangement.

2. Under the terms of the sublease, Sichuan Garden agreed to pay part of its rent to the partnership and part to the owner of the building.

chuan Garden] ... in the amount of Five Hundred Dollars ($500.00) per month, commencing May, 1982. Remittance shall be made by Sublessor to the procuring agent within five (5) days of its receipt of monthly rental.... In the event that the Sublessee commits a default under the terms of this Sublease which results in the subsequent eviction of the Sublessee from the leased premises, the procuring agent shall have no cause of action, claim or demand for further commissions from Sublessor or any subsequent sublessee, tenant or occupant of the leased premises.

Before the partnership could enter into the subleasing agreement, however, Security National had to restore possession of the premises to the partnership. It agreed to do so, in return for the partnership's agreement to assign to Security National the rental proceeds which it would receive from Sichuan Garden under the sublease. The assignment contract, entitled "Assignment of Leases, Rents and Profits," provided that Security National was to apply these payments according to the terms of a simultaneously executed letter. In pertinent part, that letter read as follows:

(a) $4,700.00 of each monthly rental payment shall be applied by the Bank against the Indebtedness, first against late charges, if any, then against all accrued but unpaid interest, then in reduction of principal.

(b) $500.00 from each monthly rental payment shall be disbursed to Al Stern Realty in payment of commissions due said firm under paragraph 18 of the Sublease; provided, however, the Bank's obligation to remit such $500.00 payment monthly is subject to the condition that the Bank receive the $4,700.00 referenced in (a) above.

(c) The monthly sums received by the Bank in excess of $5,200.00 shall first be applied by the Bank to reimburse itself for attorneys' fees incurred in connection with the Indebtedness in favor of [a law firm] until such sums shall aggregate $6,000.00. Thereafter the monthly excess sums shall be paid by the Bank to [another law firm] until such sums shall aggregate $11,974.89; thereafter the excess sums shall be accumulated by the Bank in a passbook savings account under the exclusive dominion and control of the Bank until the sums having been deposited to such account shall aggregate $12,000.00 and such sums and the interest thereon shall be held by the Bank as additional collateral security for the repayment of the Indebtedness. After the aforesaid $12,000.00 shall have been accumulated in the referenced passbook account, the remaining excess monthly rental payments shall be applied as Bank may be directed by the Undersigned.[3]

In May 1982 the five appellees, judgment creditors of the Apple Tree,[4] served writs of attachment on Sichuan Garden, which in the interim had opened a new restaurant in the leased premises. *See* Super.Ct.Civ.R. 69–I. Sichuan Garden responded to the writs by stating that the rental payments which it owed to the partnership under the sublease had been assigned to Security National, and therefore were no longer funds to which the partnership had any claim. Appellees filed motions for judgment of condemnation, which were consolidated for a hearing on August 20. Meanwhile appellees entered into a stipulation with the partnership and Security National under which they agreed that out of each monthly rental payment of $6,500, Security National could keep $4,700, which represented the repayment of its secured loan, plus an addi-

---

3. In March 1982 the partnership informed all of its creditors by letter that the premises which its restaurant had once occupied had been sublet to Sichuan Garden and that it had assigned its rights to the monthly rent under the sublease to Security National.

4. Three of the five had become judgment creditors before the assignment of rental payments to Security National.

tional $1,300 per month until it recovered $6,000 which it had spent on attorney's fees.[5] Appellant filed a motion asserting his claim to the funds being attached. He argued that $500 out of each monthly rental payment had been paid in trust to the partnership for his benefit, and asked that the stipulation among the five appellees, the partnership, and Security National be set aside.

The court held the scheduled hearing and took the case under advisement. In a memorandum opinion entered October 1, the court found that the assignment of the rental payments by the partnership to Security National had the effect of creating a preference for appellant and one of the law firms over other general unsecured creditors, and ruled that to that extent it was invalid. The court also held, however, that the rental payments which the assignment allocated to Security National for the satisfaction of its secured claim was valid because, under D.C.Code § 28–2107 (1981), the "prohibition against preferences [did] not affect the priority of liens and encumbrances created bona fide and existing before the execution of the assignment." In conclusion, the court found that those rental payments not properly assignable to Security National belonged to the partnership and "[a]s such ... [were] subject to execution by its judgment creditors." The court therefore granted appellees' motions for judgment of condemnation, but stayed execution of that part of its order "until such time as Sichuan Garden has credits in its possession that are due and payable to Apple Tree, as opposed to credits that have been properly assigned to [Security National]."

■ On October 12 appellant filed a motion for reconsideration, arguing that his claim to a monthly commission was "based upon a prior existing lien on the funds" and was not in any way affected by the assignment.[6] The court denied the motion on December 2. On December 17 appellant filed a notice of appeal from the October 1 order.[7] At the same time he filed a motion for a stay of that order and requested that Sichuan Garden and Security National be directed to pay $500 each month into the registry of the court during the pendency of this appeal. On December 22 the court granted this motion.

Meanwhile, on November 17, the Internal Revenue Service served a notice of tax levy upon Security National stating that the partnership owed the federal government $95,515.34 in unpaid taxes. By January 1983 Security National had collected its attorney's fees and was holding $7,933.07 in escrow. Faced with the October 1 order requiring it to return any excess monies to Sichuan Garden, the December 22 order requiring it to pay $500 each month into the registry of the court, and the IRS's notice of tax levy, Security National filed a motion for interpleader under Super.Ct.

---

5. On August 6 Judge Wertheim of the Superior Court entered an order directing Sichuan Garden continue to make its monthly rent payments to Security National. The bank was to retain "(a) $4,700.00 per month, plus (b) an additional $1,300.00 per month until the sum of $6,000 [was] paid." Judge Wertheim further ordered that the balance of "the monthly rental payments ... be held by [the bank] in an interest-bearing escrow account...."

6. In his supporting papers appellant characterized this "prior existing lien" as an equitable lien. He also argued that the rental payments representing his commission were held in trust by the partnership.

7. Copies of the October 1 order were mailed to the parties, since the order was not entered in their presence. The October 12 motion for reconsideration, which was filed under Super.Ct. Civ.R. 59(e), was therefore timely. *Wallace v. Warehouse Employees Union,* 482 A.2d 801, 805–808 (D.C.1984). This means that the time for noting an appeal from the October 1 order began to run again upon the denial of the motion to reconsider. *Coleman v. Lee Washington Hauling Co.,* 388 A.2d 44 (D.C.1978); D.C.App.R. 4–II(a)(2). In a civil case the losing party has thirty days within which to file a notice of appeal. D.C.App.R. 4–II(a)(1). Appellant's notice of appeal, filed fifteen days after the court denied his Rule 59(e) motion, was therefore timely, and we have jurisdiction to entertain this appeal.

Civ.R. 22.[8] After a hearing, the court stayed any further action pending the outcome of this appeal.

## II

Appellant maintains that he is entitled to a commission of $500 per month under the subleasing agreement. He argues first that clause 18 of the subleasing agreement, quoted at pages 85–86, *supra*, established a trust under which he was the designated beneficiary. Under his theory, the partnership became a trustee for that portion of the monthly rent which represented his commission, and therefore the creditors of the partnership had no right to attach that money. Alternatively, appellant contends that the court should have imposed an equitable lien or constructive trust on that portion of the monthly rent set apart as his commission.

In order to recover his commission, a real estate broker must prove the existence of an express or implied contract making him the agent of the owner of the property. *See Apostolides v. Colecchia*, 221 A.2d 437, 438–439 (D.C.1966); *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 479 F.2d 201 (1973). *See also* 12 C.J.S. *Brokers* § 118 (1980). In contracts involving the sale of land, "a broker's right to a commission may be made dependent or contingent upon the fulfillment of conditions such as the payment of the purchase price or the consummation of the transaction." *Dal Maso v. Gregory*, 112 A.2d 923, 924 (D.C.1955) (citation omitted); *see Krebs v. Morgan*, 143 A.2d 518, 519–520 (D.C.1958); *Sweet v. H.R. Howenstein Co.*, 64 App.D.C. 20, 21, 73 F.2d 660, 661 (1934). Similarly, a broker's commission for negotiating a lease may be made contingent upon the collection of rent from the lessee. *See* 12 C.J.S. *Brokers* § 180 (1980). In this case we assume, in the absence of any evidence to the contrary, the existence of a brokerage contract between appellant and the partnership.[9]

Appellant argues that clause 18 of the subleasing agreement between Sichuan Garden and the partnership established an express trust for the commission monies owed to him. The RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) defines a trust as

a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.

A critical element in the creation of an express trust is "the settlor's manifestation or external expression of his intention or create a trust." *Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C.1983) (citation omitted). Appellant contends that a plain reading of clause 18 establishes that the partnership was a trustee for $500 of the monthly rent representing his commission. We do not find such clarity in the wording of clause 18. There is no language there—or anywhere else in the sublease—purporting to create a trust in appellant's favor.[10] There is no evidence, either in the sublease or elsewhere, of any intent by the partnership to create a trust. Indeed, the partnership's assignment of the entire rental proceeds to Security National simultaneously with the execution of the sublease is inconsistent with any such intent. We hold, therefore,

---

**8.** Super.Ct.Civ.R. 22 is identical to section 1 of FED.R.CIV.P. 22.

**9.** Appellant's motion asserting his claim to the attached funds referred only to the sublease, which characterized him as "the procuring agent for this ... transaction" in clause 18. He based his claim entirely on the agreement between the partnership and Sichuan Garden, under which he is at best a third-party beneficiary. He never alleged the existence of a separate brokerage contract between himself and the partnership. Nevertheless, it has apparently been assumed by everyone throughout this litigation that appellant was in fact the partnership's agent.

**10.** *Klein v. Bryer*, 227 Md. 473, 177 A.2d 412 (1962), on which appellant strongly relies, is distinguishable on this ground.

that appellant is not the beneficiary of any express trust but an ordinary creditor of the partnership. As appellees correctly observe in their brief, the arrangement for paying $500 monthly to appellant set forth in clause 18 "was not a trust, but merely a contract subject to a condition." Appellant may be a third-party beneficiary of that contract, but he is not a cestui que trust.[11]

■ Appellant's fallback argument is that the trial court should have imposed a constructive trust or an equitable lien on a portion of the attached funds sufficient to satisfy his claim. Constructive trusts and equitable liens, however, are equitable remedies designed to prevent fraud or unjust enrichment. There is no evidence of either in this case, nor do we find any other kind of situation which equity would regard as the basis for such a remedy. On the contrary, the public policy of the District of Columbia, as embodied in D.C.Code § 28–2107 (1981), forbids an insolvent debtor from establishing a preference for one creditor over others.[12] While this statute does not apply directly to the instant case, as the trial court recognized, it does reflect a determination by Congress that an insolvent debtor may not undermine the rights of his creditors by assigning to one any asset in which all have a right to share. That is precisely what the insolvent partnership attempted to do here when it purported to assign $500 out of each month's rental payment for appellant's benefit. Thus we conclude that the creation of a constructive trust or equitable lien in this case would be contrary to public policy.[13]

### III

On November 17, 1982, the Internal Revenue Service served Security National with a notice of tax levy for $95,515.34, which the partnership owed to the federal government for unpaid taxes. In January 1983 Security National was holding $7,933.07 of partnership funds in an escrow account. The proper disposition of these funds, however, was not at all clear, given the court's October 1 order requiring it to return any excess sums to Sichuan Garden, the December 22 order requiring it to pay $500 from each month's rent that it received into the court registry, and the Internal Revenue Service's notice of tax levy. As a result, Security National filed a motion for interpleader under Super.Ct.Civ.R. 22.

■ The Federal Tax Lien Act, 26 U.S.C. §§ 6321–6323, creates a lien in favor of the federal government against "all property and rights to property" of "any person liable to pay any tax [who] neglects or refuses to pay the same after demand...." 26 U.S.C. § 6321. Thus, be-

---

11. Even if the contract could be read somehow as creating a trust, there was no trust res until Sichuan Garden made its monthly rental payments to Security National. Thus Sichuan Garden could not be regarded as the trustee because it never had possession of the res; when the money was in Sichuan Garden's possession (*i.e.*, before the rent was paid each month), it was unquestionably the property of Sichuan Garden. The only possible trustee, even under appellant's theory, would be Security National, and there is no way on the facts of this case to regard Security National as a trustee.

12. D.C.Code § 28–2107 provides:

A provision in a voluntary assignment [for the benefit of creditors] made for the payment of one debt or liability in preference to another is void, and all debts and liabilities within the provisions of the assignment shall be paid pro rata from the assets. This section does not affect the priority of liens and in-

cumbrances created bona fide and existing before the execution of the assignment.

13. Appellant urges us to adopt the holding of a Florida court in *Campbell v. Pace*, 369 So.2d 413 (Fla.Dist.Ct.App.1979). The court held in *Campbell* that two real estate brokers were entitled to have the proceeds of a foreclosed mortgage impressed with an equitable lien or a constructive trust. We need not decide here whether *Campbell* should be followed in the District of Columbia, for there is at least one critical factual difference between *Campbell* and the case at bar. In *Campbell* the brokers' claim was based on an express contract between the brokers and the property owner for payment of a commission. Appellant's claim, however, is based on the subleasing agreement between the partnership and Sichuan Garden, to which he was not even a party. His position is therefore at least one step removed from that of the brokers in *Campbell*.

fore a federal tax lien may arise, there must be an assessment showing that tax is due, a demand that it be paid, and a failure to pay after the demand is made. The lien which may result, however, is deemed to arise at the time the assessment is made. 26 U.S.C. § 6322. The notice of tax levy served on Security National read in pertinent part as follows:

| Date of Assessment | Taxpayer Identification Number | Unpaid Balance of Assessment | Statutory Additions | Total |
|---|---|---|---|---|
| 6/15/81 | 54–1014812 | $11,178.87 | $3,295.53 | $14,474.40 |
| 9/21/81 | | 16,563.72 | 4,103.71 | 20,667.43 |
| 9/14/81 | | 15,778.11 | 4,109.10 | 19,887.21 |
| 10/27/81 | | 12,416.30 | 3,035.23 | 15,451.53 |
| 3/15/81 | | 16,357.68 | 2,015.80 | 18,373.48 |
| 7/19/82 | | 891.41 | 53.08 | 944.49 |
| 3/16/82 | | 1,865.83 | 650.83 | 2,516.66 |
| 5/3/82 | | 2,851.00 | 349.14 | 3,200.14 |
| | | | *Total Amount Due:* | $95,515.34 |

The date on which each appellee became a judgment creditor and the amount of each judgment are shown in the following table:

| Creditor | Date Judgment Recorded | Amount |
|---|---|---|
| J. Nichols Produce Co. | 8/20/81 | $3,720.00 |
| Kolker Brothers, Inc. | 8/20/81 | 850.00 |
| Standard Line Supply, Inc. | 12/16/81 | 2,306.83 |
| Mirman Brothers, Inc. | 4/29/82 | 5,000.27 |
| ABCO Corp. | 4/27/82 | 4,891.48 |

The Federal Tax Lien Act provides in 26 U.S.C. § 6323(a) that "[t]he lien imposed by section 6321 shall not be valid as against any ... judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." In the District of Columbia, notice of the tax lien must be filed in the Office of the Recorder of Deeds. 26 U.S.C. § 6323(f)(1)(C). The notice of tax levy in the instant case is dated October 21, 1982, but it does not indicate when or even if it was recorded. The assessments for delinquent taxes listed in the notice date back to June 1981. Thus it may well be that the IRS filed one or more tax lien notices with the Recorder of Deeds before some or all of the appellees in this case recorded their judgments, thereby giving its lien priority over theirs.[14] These are matters for the trial court to resolve at the hearing on the motion for interpleader.

## IV

We affirm that portion of the trial court's judgment which denies appellant's claim for preferential assignment of $500 from the monthly rental proceeds. We remand the remainder of this case to the trial court so that it may rule on Security National's motion for interpleader and on any other matters relating to the notice of tax levy issued by the Internal Revenue Service.

*Affirmed in part, remanded in part.*

14. On July 8, 1983, appellees J. Nichols Produce Company and Kolker Brothers, Inc., filed praecipes with the trial court stating that their judgments had been satisfied. Appellee Standard Line filed a similar praecipe with the court on September 8. Although they do not claim any portion of the monies being held in escrow by Security National, the IRS's notice of tax levy puts into question the propriety of the satisfaction of their judgment liens ahead of the federal government's tax lien.